**Opinion issued July 14, 2015.**



In The

# Court of Appeals

For The

# First District of Texas

————————————

**NO. 01-14-00863-CV**

————————————

**WEATHERFORD ARTIFICAL LIFT SYSTEMS, INC., Appellant**

**V.**

**A&E SYSTEMS SDN BHD, Appellee**

---

**On Appeal from the 295th District Court**
**Harris County, Texas**
**Trial Court Case No. 2012-62091**

---

# O P I N I O N

In this interlocutory appeal, Weatherford Artificial Lift Systems, Inc. [hereafter, "Weatherford"] appeals the trial court's granting the special appearance of A&E Systems SDN BHD [hereafter, "A&E Malaysia"]. *See* TEX. CIV. PRAC. & REM CODE ANN. § 51.014(a)(7) (West Supp. 2012). Weatherford contends that the

trial court erred by granting the special appearance because A&E Malaysia is subject to specific personal jurisdiction in Texas. We affirm.

## BACKGROUND

Appellant, Weatherford Artificial Lift Systems, Inc., is a subsidiary of Weatherford International, Ltd. Weatherford is a Texas corporation that maintains a principal office and headquarters in Houston, Texas.

A&E Systems SDN BHD is a Malaysian corporation that specializes in the manufacturing and provision of anti-corrosion coatings and paints typically used in oil and gas activities. Its trademark products are Alocit and Enviropeel, two kinds of anti-corrosion coatings designed for asset protection in the oil and gas industry. A&E Malaysia's principal office and headquarters are in Malaysia.

A&E Anti-Corrosion Systems, L.L.C. [hereafter, A&E USA] is a Florida limited liability company with its sole office and headquarters in Ponte Vedra, Florida. It was established as a Florida company in November 2009; prior to that A&E USA was a Delaware limited liability company, but the Delaware company was merged into the Florida company in December 2009. A&E USA is a wholly owned subsidiary of A&E Malaysia. The two companies have separate, but somewhat overlapping, management. A&E Maylasia's management consists of the following: Arthur Haycox, CEO; David Lee, CFO; Simon Haycox, Technical Director; and Mazlan Abdul Majid, Chairman. A&E USA's management consists

2

of the following: Richard Hoyland, Manager; Arthur Haycox, Manager; and Mazlan Abdul Majid, Manager. Of significance to this case, Arthur Haycox serves in management positions in both companies; he is the CEO of A&E Malaysia and a manager of A&E USA. A&E Malaysia often uses the name "A&E Group" to collectively refer to itself and its subsidiaries, though "A&E Group" is not a legal entity.

There is evidence that whenever A&E USA would receive a purchase order from a United States-based company, A&E USA would place an order with A&E Malaysia for the manufacture of the equipment or product specified. Once the United States customer paid A&E USA, A&E USA would then pay A&E Malaysia a portion of the payment it received for the product.

In the summer of 2009, a Weatherford employee brought the Enviropeel and Alocit products to the attention of Todd Travis, Weatherford's Global Business Manager. Shortly thereafter, Travis initiated contact with "A&E Group" by clicking on a link through its global website, which generated an email to an officer at A&E Malaysia. Arthur Haycox eventually responded to Travis's inquiry about Enviropeel and Alocit.

Shortly thereafter, in August 2009, Travis wrote Arthur Haycox, stating that Weatherford was interested in pursuing a joint venture with "A&E Systems, USA." The letter, addressed to Mr. Arthur Haycox at "A&E Systems," stated:

> This letter is to confirm Weatherford's (WFT) interest in forming a joint venture (JV) **with A&E Systems, USA** for the exclusive distribution and application of coating Enviropeel and Alocit, here after termed "the coatings", within North and South America regions. The JV will include licensing agreement for sales and application of the coatings for all wellheads globally.

(Emphasis added). Also in August 2009, Haycox invited Travis to attend a "grand opening" of A&E Malaysia's warehouse in Malaysia, which Travis did in August 2009.

Around the same time that Travis visited the Malaysian warehouse, Weatherford began to purchase Alocit and Enviropeel units for potential marketing to Weatherford customers. The purchase orders list the supplier as "A&E Anti Corrosion Systems, LLC," or A&E USA, as the supplier. The record contains seven such purchase orders, the earliest dated August 3, 2009, and the last one dated February 11, 2010. While there is evidence that Arthur Haycox told Weatherford it could issue purchase orders to A&E Malaysia, Weatherford did not. Weatherford's purchases were all from A&E USA. Travis testified by affidavit that Arthur Haycox told him that "if Weatherford and A&E Group's relationship did not work out at any point during the first year, that A&E Group would repurchase the products from Weatherford." Only two of the units purchased were actually shipped to Weatherford; the rest remained at the warehouse in Malaysia while the parties worked toward establishing the joint venture.

4

During negotiations to work out the joint venture with A&E USA, draft contracts prepared by Weatherford provided that Harris County, Texas, would be the site of any arbitration in the event of a dispute. The draft "Product Supply and Distribution Agreement" also stated that title to the goods would transfer to Weatherford "at the port in Malaysia."

Also during negotiations for the joint venture, in October 2009, Arthur Haycox sent marketing tools to Weatherford for use in showing the products to Weatherford's clients. And, in the fall of 2009, Richard Hoyland, of A&E USA, and Simon Haycox, of A&E Malaysia, went to Houston to train Weatherford employees about the use of the Alocit and Enviropeel products at Weatherford's facilities in Houston.

By March 2010, the parties had still not agreed to terms regarding the joint venture. On March 2, 2010, Arthur Haycox traveled to Houston and, along with A&E USA's Richard Hoyland, met with Weatherford's Vice President, David Colley about moving forward with the parties' relationship. Haycox swore by affidavit that he attended this meeting in his capacity at a manager of A&E USA. According to Weatherford's second amended petition, during the next few months, the parties "struggled to communicate about or agree upon how to proceed forward," and "it became clear" that the relationship "required termination." It is undisputed that no joint venture was ever reached, and Weatherford's second

5

amended petition contains no claim or causes of action relating to the aborted attempts to form a joint venture with A&E USA.

On June 16, 2010, Weatherford manager Travis traveled to Kuala Lumpur, Malaysia, to meet with Arthur Haycox and negotiate a return of the products. After the meetings, Haycox emailed Travis their agreed negotiated terms, which the parties refer to as the Exit Agreement.[1]  The Exit Agreement is the contract giving rise to the underlying lawsuit.  The term of the Exit Agreement giving rise to the present dispute provides:

> A&E will purchase all unused Enviropeel Units from [Weatherford] on or before 31st Dec 2010 (a list of the numbered units is attached), at the original purchase price from [A&E USA].

After the Exit Agreement was reached, Weatherford returned the products it had received to A&E USA in Florida.  The items purchased, but never shipped, remained in the warehouse in Malaysia.

On March 24, 2011, A&E USA, via its manager Richard Hoyland, issued a series of credit notes to Weatherford, which stated that "Credits can be taken against all orders placed by the Weatherford organizations with [A&E USA] on a Global basis[.]"  The credit notes also discounted the original purchase price of some of the products based on their age and color.

---

[1]  For purposes of examining jurisdiction, we will assume without deciding that this is a valid and enforceable contract.  We express no opinion as to the validity or enforceability of this contract, or whether it was breached by either party.

A dispute soon arose over compliance with the Exit Agreement. In particular, Weatherford objected to not being reimbursed in cash rather than credit and to the discounted values reflected in the credit notes. In 2012, Weatherford sued A&E USA for breach of contract and unjust enrichment. In sum, Weatherford alleged that A&E USA breached the Exit Agreement "by refusing to either 1) remit payment to Weatherford for the Products that Weatherford has paid for; or 2) deliver the Products which Weatherford has already purchased."

In 2014, Weatherford filed a Second Amended Petition, and, for the first time, asserted claims against A&E Malaysia. Weatherford pleaded the same causes of action—breach of contract, unjust enrichment, fraudulent misrepresentation, and negligent misrepresentation—against both A&E USA and A&E Malaysia, claiming that "the entities were so intermingled that A&E USA was nothing more than the 'alter ego' of A&E Malaysia," and that "A&E Malaysia is jointly and severally liable for the wrongful conduct of A&E USA."

A&E Malaysia filed a Special Appearance, and Weatherford responded, claiming that A&E Malaysia's contacts with Texas were sufficient to establish specific jurisdiction, and that "A&E USA is the Alter Ego of A&E, and the Two Must Be 'Fused' For Jurisdictional Purposes." The trial court granted A&E Malaysia's special appearance, and Weatherford then filed this accelerated appeal.

## SPECIFIC JURISDICTION

In two related issues on appeal, Weatherford contends the trial court erred in granting A&E Malaysia's special appearance because (1) A&E Malaysia has sufficient minimum contacts with Texas to establish specific personal jurisdiction, and (2) exercising jurisdiction over A&E Malaysia would not offend traditional notions of fair play and substantial justice.

### *Standard of Review*

Whether a trial court has personal jurisdiction over a nonresident defendant is a question of law. *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 790–91 (Tex. 2005); *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). Because the trial court's exercise of personal jurisdiction over a nonresident defendant involves a question of law, an appellate court reviews the trial court's determination of a special appearance de novo. *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007); *BMC Software*, 83 S.W.3d at 794. However, the trial court must frequently resolve fact questions before deciding the jurisdictional question. *BMC Software*, 83 S.W.3d at 794; *Capital Tech. Info. Servs., Inc. v. Arias & Arias, Consultores*, 270 SW.3d 741, 748 (Tex. App.—Dallas 2008, pet. denied) (en banc). In a special appearance, the trial court is the sole judge of the witnesses' credibility and the weight to be given their testimony. *Leesboro Corp. v. Hendrickson*, 322 S.W.3d 922, 926 (Tex. App.—

Austin 2010, no pet.). We do not "disturb a trial court's resolution of conflicting evidence that turns on the credibility or weight of the evidence." *Ennis v. Loiseau*, 164 S.W.3d 698, 706 (Tex. App.—Austin 2005, no pet.). When a trial court does not issue findings of fact or conclusions of law, "all facts necessary to support the judgment and supported by the evidence are implied." *BMC Software*, 83 S.W.3d at 795. We will affirm the trial court's ruling on any legal theory that finds support in the record. *Dukatt v. Dukatt*, 355 S.W.3d 231, 237 (Tex. App.—Dallas 2011, pet. denied).

***Applicable Principles of Law***

A Texas court may assert personal jurisdiction over a nonresident defendant if (1) the Texas long-arm statute authorizes the exercise of jurisdiction, and (2) the exercise of jurisdiction is consistent with federal and state constitutional due-process guarantees. *Moki Mac*, 221 S.W.3d at 574. "Because the Texas long-arm statute reaches 'as far as the federal constitutional requirements of due process will allow,' the statute is satisfied if the exercise of personal jurisdiction comports with federal due process." *Preussag Aktiengesellschaft v. Coleman*, 16 S.W.3d 110, 113 (Tex. App.—Houston [1st Dist.] 2000, pet. dism'd w.o.j.) (*quoting CSR, Ltd. v. Link*, 925 S.W.2d 591, 594 (Tex. 1996)).

Personal jurisdiction is proper when the nonresident defendant has established minimum contacts with the forum state, and the exercise of jurisdiction

9

comports with "traditional notions of fair play and substantial justice." *Moki Mac*, 221 S.W.3d at 575 (*citing Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 158 (1945)). Minimum contacts are sufficient for personal jurisdiction when the nonresident defendant has purposefully availed himself of the privileges of conducting activities within the forum state, thus invoking the benefits and protections of its laws. *Id* . (*citing Hanson v. Denckla*, 357 U.S. 235, 253, 78 S. Ct. 1228, 1240 (1958)).

A nonresident defendant's forum-state contacts may give rise to two types of personal jurisdiction: specific and general. *Id.* When specific jurisdiction is alleged, the inquiry focuses on the relationship among the defendant, the forum, and the litigation. *Id.* at 575–76. Purposeful availment alone will not support an exercise of specific jurisdiction. *Id.* at 579. Rather, specific jurisdiction has "two co-equal components," and "purposeful availment has no jurisdictional relevance unless the defendant's liability arises from or relates to the forum contacts." *Id.* For a nonresident defendant's forum contacts to support an exercise of specific jurisdiction, "there must be a substantial connection between those contacts and the operative facts of the litigation." *Moki Mac*, 221 S.W.3d at 585; *see Rush v. Savchuk*, 444 U.S. 320, 329, 100 S. Ct. 571, 578 (1980)). The operative facts of the litigation are those facts that would be the focus of the trial. *Pulmosan Safety*

10

*Equip. Corp. v. Lamb*, 273 S.W.3d 829, 839 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (*citing Moki Mac*, 221 S.W.3d at 585).

A general jurisdiction inquiry is very different from a specific jurisdiction inquiry. It requires a "more demanding minimum contacts analysis," *PHC–Minden, L.P. v. Kimberly–Clark Corp.*, 235 S.W.3d 163, 168 (Tex. 2007) (*quoting CSR, Ltd.*, 925 S.W.2d at 595), with a "substantially higher" threshold. *Id.* (quoting 4 WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1067.5 (2007)). Usually, "the defendant must be engaged in longstanding business in the forum state, such as marketing or shipping products, or performing services or maintaining one or more offices there; activities that are less extensive than that will not qualify for general in personam jurisdiction." *Id*. General jurisdiction is "dispute-blind," meaning that it is an exercise of the court's jurisdiction made without regard to the nature of the claim presented or whether the defendant's alleged liability arises from those contacts. *Id.* The central question is whether the defendant's contacts are "continuous and systematic" such that the relationship between the nonresident and the state approaches the relationship between the state and its own residents. *Id.* (*citing Helicopteros Nacionales de Columbia, S.A. v. Hall*, 638 S.W.2d 870, 882 (Tex. 1982) (Pope, J., dissenting), *rev'd*, 466 U.S. 408, 104 S. Ct. 1868 (1984)).

*Jurisdictional Alter Ego*

In the trial court, both in its Second Amended Petition and its Response in Opposition to Defendant [A&E Malaysia's] Special Appearance, Weatherford argued that A&E USA was the alter ego of A&E Malaysia and that their jurisdictional contacts must be "fused." Before this Court can determine which jurisdictional contacts are imputable to A&E Malaysia, we must first address the issue of jurisdictional alter ego.

This Court has explained the notion of jurisdictional alter ego as follows:

A parent company and its subsidiary may be "fused" for jurisdictional purposes if the plaintiff proves that "the parent controls the internal business operations and affairs of the subsidiary." [*BMC Software Belgium, N.V. v. Marchand*, 83 S.W. 3d 789, 799 (Tex. 2002)]."But the degree of control the parent exercises must be greater than that normally associated with common ownership and directorship; the evidence must show that the two entities cease to be separate so that the corporate fiction should be disregarded to prevent fraud or injustice." *Id.* (*citing Hargrove v. Fibreboard Corp.*, 710 F.2d 1154, 1159 (5th Cir. 1983)). A parent company cannot be subjected to personal jurisdiction based on the local activities of its subsidiary when "the subsidiary's presence in the state is primarily for the purpose of carrying on its own business and the subsidiary has preserved some semblance of independence from the parent and is not acting as merely one of its departments. . . ." 4A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1069.4 (3d ed. 2002)."[T]he party seeking to ascribe one corporation's actions to another by disregarding their distinct corporate entities [must] prove this allegation, because Texas law presumes that two separate corporations are distinct entities." *PHC–Minden, L.P. v.. Kimberly–Clark Corp.*, 235 S.W.3d 163, 173 (Tex. 2007)."[V]eil-piercing for purposes of liability ('substantive veil-piercing') is distinct from imputing one entity's contacts to another for jurisdictional purposes ('jurisdictional veil-piercing')." *Id.* at 174.

12

> Our Supreme Court has identified four relevant factors in the jurisdictional veil-piercing analysis: (1) the amount of the subsidiary's stock owned by the parent corporation; (2) the existence of separate headquarters; (3) the observance of corporate formalities; and (4) the degree of the parent's control over the general policy and administration of the subsidiary. *Id.* at 175 (citing 4A WRIGHT & MILLER, supra, § 1069.4). Parent companies normally exercise at least some control over their subsidiaries, and "[a] subsidiary corporation will not be regarded as the alter ego of its parent merely because of stock ownership, a duplication of some or all of the directors or officers, or an exercise of the control that stock ownership gives to stockholders." *Gentry v. Credit Plan Corp. of Houston*, 528 S.W.2d 571, 573 (Tex. 1975).

*Mikuni Corp. v. Foster*, No. 01-11-00383-CV, 2012 WL 170603, at *4–5 (Tex. App.—Houston [1st Dist.] Jan. 19, 2012, no pet.) (mem. op.).

When the trial court granted A&E Malaysia's Special Appearance, it necessarily found against Weatherford on its jurisdictional alter-ego argument. And, while Weatherford at times refers to A&E USA and A&E Malaysia interchangeably as "A&E Group" and seeks to impute the A&E USA's contacts to A&E Malaysia in its arguments, Weatherford does not bring an appellate issue challenging the trial court's implied finding against alter ego. Indeed, Weatherford's appellate brief does not mention jurisdictional alter ego at all, nor does it analyze the alter ego issue using the test set forth by the supreme court in *PHC-Minden*. Thus, even if appellant's brief could be construed as attacking the negative alter ego finding, it is nonetheless deficient. When an appellate issue is unsupported by argument or contains an argument lacking citation to the record or

13

legal authority, nothing is presented for review. *Republic Underwriters Ins. Co. v. Mex. Tex., Inc.*, 150 S.W.3d 423, 427 (Tex. 2004); *see also* TEX. R. APP. P. 38.1(i). Because Weatherford has not challenged the implied negative alter ego finding, we will not attribute A&E USA's contacts to A&E Malaysia, and, to the extent there is a fact issue regarding to whom a contact is attributable, we will not disturb the trial court's resolution of that issue and will imply all facts necessary to support the judgment. *See BMC Software*, 83 S.W.3d at 795.

***The Contacts Relied Upon by Weatherford and to Whom Attributable***

Before determining whether the contacts are sufficient to establish personal jurisdiction, the Court must first determine to whom they are attributable—A&E USA or A&E Malaysia. Weatherford relies on the following contacts to establish personal jurisdiction over A&E Malaysia.

1. A draft Confidentiality and Non-Disclosure Agreement between "A&E Group, having an address at 37B, Jalan USJ 21/11, UEP Subang Jaya, 47600 Subang Jaya, Selangor [Malaysia] and Weatherford International Ltd. (Weatherford), having an address at 515 Post Oak Blvd., Houston, Texas 77027, USA." This document is dated July 15, 2009, and was sent from Malaysia to Texas shortly before Weatherford's manager, Travis, traveled to A&E Malaysia to visit the grand opening of its warehouse. It was never signed by any party. Because it was sent by "A&E Group" from Malaysia and references a Malaysia address, this will be attributed to A&E Malaysia, not A&E USA.

2. A draft Product Supply and Distribution Agreement between Weatherford and "A&E Group" that was drafted by Weatherford and sent by email to Arthur Haycox, which provided that "Arbitration proceedings shall be held in Harris County, Texas,

USA." The document was never signed by any party. Furthermore, the proposed joint venture was to have been between Weatherford and A&E USA, thus the contract drafted in furtherance of that proposed joint venture is necessarily attributable to A&E USA, not A&E Malaysia.

3. An email from A&E Malaysia to Weatherford in Texas with an attached powerpoint for Weatherford to use in explaining the Enviropeel and Alocit products that it had purchased from A&E USA to its customers. This is attributable to A&E Malaysia.

4. A trip to Houston by A&E USA employee, Richard Hoyland, and A&E Malaysia employee, Simon Haycox, to provide training to Weatherford employees regarding the Enviropeel products that Weatherford had purchased from A&E USA. The trip by Simon Haycox is attributable to A&E Malaysia, but the trip by Hoyland is attributable to A&E USA.

5. A "few" meetings between Arthur Haycox and Todd Travis in Houston. Because Arthur Haycox is employed by both A&E USA and A&E Malaysia, we resolve the dispute as to which company he was representing at the time in the light most favorable to the trial court's ruling. Thus, we consider Haycox's meetings in Houston to be attributable to A&E USA.

6. A meeting in Texas on March 2, 2010, between Arthur Haycox, Richard Hoyland, and Weatherford Vice President David Colley to discuss the parties' relationship. Again, we consider Haycox's participation in this meeting in the light most favorable to the trial court's ruling, i.e., attributable to A&E USA.

7. The "Exit Agreement," which is memorialized in a June 18, 2010 email from Arthur Haycox to Todd Travis, was sent from Malaysia to Texas, and provided that "A&E will purchase all unused Enviropeel Units from WEP on or before 31st Dec 2010 . . . at the original purchase price from A&E Anti Corrosion LLC [A&E USA]." The Exit Agreement was negotiated in Malaysia after Travis traveled to Malaysia and sent by email from Malaysia. Although Haycox's email does not indicate whether he is acting for A&E USA or A&E Malaysia, the fact that the email

15

distinguishes "A&E" from "A&E Anti Corrosion LLC" is some evidence that in this instance, Haycox was acting on behalf of A&E Malaysia in offering to purchase the products back from Weatherford. The Exit Agreement is, therefore, attributable to A&E Malaysia for purposes of a jurisdictional analysis.

Thus, the only contacts that we consider attributable to A&E Malaysia are (1) the draft Confidentiality and Non-Disclosure Agreement that was never executed; (2) an email containing a powerpoint presentation that Weatherford could use to market the products it had already purchased from A&E USA to its customers; (3) a single visit to Texas by an A&E Malaysia employee to demonstrate how to use the products that Weatherford had already purchased from A&E USA; and (4) the Exit Agreement itself.

### *"Substantial Connection" to Operative Facts of the Litigation*

For Texas to exercise specific jurisdiction in this case, (1) A&E Malaysia must have made minimum contacts with Texas by "purposefully availing" itself of the privilege of conducting activities here, and (2) its liability must have arisen from or be related to those contacts. *See Moki Mac*, 221 S.W.3d at 576. Even if there is "purposeful availment" in Texas, minimum contacts will not exist, and jurisdiction will not attach, if there is not a "substantial connection" between the alleged contacts and the operative facts of the litigation. *Info. Servs. Grp., Inc. v. Rawlinson*, 302 S.W.3d 392, 404 (Tex. App.—Houston [14th Dist.] 2009, pet. denied).

A&E Malaysia argues on appeal, as it did in the trial court, that the contacts attributable to it, as opposed to those of A&E USA, do not have a substantial connection to the operative facts of the litigation.

In *Moki Mac*, the court analyzed whether there was a substantial connection between the alleged contact and the operative facts of the suit. 221 S.W.3d at 569. In doing so, the court considered whether the alleged contact would "be the focus of the trial," or "[would] consume most if not all of the litigation's attention[.]" *Id.* at 585. In sum, the court instructed us to consider whether the alleged contact was "the subject matter of the case," or was "related to the operative facts" of the cause of action asserted. *Id.* The court concluded that the alleged contact—a misrepresentation in a sales brochure—was not substantially related to the cause of action asserted—negligence of tour guides in leading a hike of the Grand Canyon that resulted in the plaintiffs' son's death. *Id.* "Whatever connection there may be between Moki Mac's promotional materials sent to Texas and the operative facts that led to Andy's death, we do not believe it is sufficiently direct to meet due process concerns." *Id.*

The causes of action asserted by Weatherford in its Second Amended Petition are breach of contract, unjust enrichment, and fraudulent misrepresentation. Specifically, Weatherford pleaded that "A&E has breached the terms and conditions of the Exit Agreement by failing to perform as required

17

thereunder, namely by refusing to remit any payment to Weatherford for the Products that Weatherford paid for and either returned or that were never even received by Weatherford." Similarly, the unjust enrichment claim is based on A&E Malaysia's alleged failure to "remit[] the payments it owes to Weatherford[,]" and the fraudulent misrepresentation claim is based on its alleged "representation to Weatherford that it would buy back the Products from Weatherford and refund monies paid if the forecasted business relationship between the Parties' did not work out." Thus, the operative facts in this case will involve evidence regarding the rights and obligations arising out of the Exit Agreement, i.e., whether A&E Malaysia promised, but did not, pay Weatherford for the products returned.

Of the four contacts with Texas attributable to A&E Malaysia, three do not have the necessary connection to the operative facts of the lawsuit. The Confidentiality and Non-Disclosure Agreement that A&E Malaysia sent to Weatherford before its manager, Travis, traveled to Malaysia to visit A&E Malaysia's warehouse was never executed by either party, and evidence regarding its existence will have little, if anything to do with the evidence presented at trial regarding the Exit Agreement. Similarly, the fact that A&E Malaysia sent marketing materials and an employee who conducted product training to Texas will also have little relevance to the contract issues that will dominate the trial.

Weatherford's pleadings make no complaint about the marketing material or training, and it is unlikely that either party will devote significant time to presenting evidence about them at trial. *See Rawlinson*, 302 S.W.3d at 401 ("[V]isits to Texas that are unrelated to the claims asserted are insufficient to establish specific jurisdiction."). Therefore, we conclude that, just as the marketing misrepresentation was not the subject matter of or related to the operative facts of the negligence action asserted in *Moki Mac*, the Confidentiality and Non-Disclosure Agreement, marketing materials, and single training visit to Texas by A&E Malaysia's employee are not the subject matter of or related to the operative facts of the causes of action asserted by Weatherford, which all related to the allegation that A&E Malaysia failed to purchase the equipment that Weatherford had purchased from A&E USA.

Weatherford contends that

the "operative facts" that will be the focus at trial include A&E's continued efforts to create and benefit from a business relationship with Weatherford that would largely be executed in Texas, the representations and communications exchanged between the Parties regarding what they each expected from each other with regard to that business relations, A&E's promises to refund the money that Weatherford paid for the Products, the "falling out" that eventually occurred between the Parties, the instructions given to Richard Hoyland from Arthur Haycox in Malaysia regarding the issuance of the Credit Notes, and A&E's inspections and re-sale, from Malaysia, of the Products first paid for by Weatherford.

19

However, as stated earlier, the trial court could have determined that all of the negotiations in furtherance of the failed joint venture, and contacts made during those negotiations, were attributable to A&E USA rather than A&E Malaysia, and Weatherford has not challenged the trial court's implied finding on that issue. Thus, we conclude that the sole contact that is attributable to A&E Malaysia, and which involves the operative facts of the lawsuit, is the Exit Agreement itself.

### *Purposeful Availment through "Exit Agreement"*

Having determined that the Exit Agreement is A&E Malaysia's sole contact that is substantially connected to the operative facts of the lawsuit, we must next determine whether that contact is sufficient to show that A&E Malaysia purposefully availed itself of doing business in Texas because "purposeful availment" and a "substantial connection" to operative facts are both required before Texas may assert specific jurisdiction. *See Moki Mac*, 221 S.W.3d at 576; *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 806 (Tex. 2002).

An individual's contract with an out-of-state party alone cannot automatically establish sufficient minimum contacts in the other party's home forum." *Burger King v. Rudzewicz*, 471 U.S. 462, 478, 105 S. Ct. 2174, 2185 (1985). "Merely contracting with a Texas resident does not satisfy the minimum contacts requirement[;] [n]or is jurisdiction justified by the single fact that a contract is payable in Texas." *Blair Commc'ns, Inc. v. SES Survey Equip. Servs.,*

20

*Inc.*, 80 S.W.3d 723, 729 (Tex. App.—Houston [1st Dist.] 2002, no pet.). A contract is "ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction." *Burger King*, 471 U.S. at 479, 105 S. Ct. at 2185. However, a single purposeful act may suffice to establish minimum contacts providing the basis for jurisdiction. 471 U.S. at 475 n.18, 105 S. Ct. at 1284 n.18. But, purposeful availment requires a defendant to seek some benefit, advantage, or profit by availing itself of the jurisdiction. *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 784 (Tex. 2005).

Here, the trial court could have found that all the prior negotiations were between A&E USA and Weatherford in seeking to establish a joint venture, and that when those efforts came to naught, A&E Malaysia stepped in to extricate its subsidiary by offering to directly repurchase the products A&E USA had sold to Weatherford. Thus, A&E USA's negotiations cannot be "purposeful availment" by A&E Malaysia and those prior negotiations are not properly part of the jurisdictional analysis.

In *Michiana*, the court stated that the contacts of parties "who reach out beyond one state and create continuing relationships and obligations with citizens of another state" are purposeful rather than fortuitous. *Id.* at 785. The court in *Michiana* concluded that a single sale of a motorhome to a Texas resident was not

21

a purposeful availment because the relationship between the parties would end once the sale was consummated. *Id.* at 786–86.

In contrast, the Court in *Burger King* found that a franchise agreement between a Michigan franchisee, Rudzewicz, and a Florida franchisor, Burger King, resulted in personal jurisdiction over the Rudzewicz in Florida because he voluntarily accepted the "long-term and exacting regulation" of his franchise from Burger King's Florida headquarters, and his relationship to Florida could not be considered fortuitous. *Burger King*, 471 U.S. at 480, 105 S. Ct. at 2186.

Here, the Exit Agreement is more like the single RV sale in *Michiana* than the continuing franchise agreement in *Burger King*. The very nature of the Exit Agreement is to terminate, rather than create, an ongoing relationship with Weatherford in Texas. And, the ongoing relationship being terminated was between A&E USA and Weatherford. A&E Malaysia's offer to purchase equipment that Weatherford had bought from A&E USA created, at best, a one-time obligation to pay a Texas resident. That contract, if any, was negotiated entirely in Malaysia and the payment required would have been made from Malaysia. Thus, we cannot conclude that the Exit Agreement itself is a sufficient purposeful contact to satisfy jurisdictional due process.

## CONCLUSION

Based on the above, we conclude that the trial court did not err in granting A&E Malaysia's special appearance and dismissing it from the lawsuit because it lacks the minimum contacts due process requires for the trial court to exercise personal jurisdiction over it.

We affirm the trial court's order.


Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Higley and Massengale