**Opinion issued January 26, 2023**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-21-00341-CV

———————————

**PAKISTAN PETROLEUM LIMITED, Appellant**

**V.**

**SPECIALTY PROCESS EQUIPMENT CORPORATION, SPEC ENERGY DMCC, SPEC OIL & GAS FZCO, S7 CONSTRUCTION INC., AND NEWPORT OIL & GAS (USA), LLC, Appellees**

---

**On Appeal from the 11th District Court**
**Harris County, Texas**
**Trial Court Case No. 2019-35747**

---

## MEMORANDUM OPINION

### Background

In this accelerated interlocutory appeal, appellant Pakistan Petroleum Limited

(PPL) appeals the trial court's order denying its special appearance in the suit

brought against it by appellees Specialty Process Equipment Corporation, SPEC Energy DMCC, SPEC Oil & Gas FZCO, S7 Construction Inc., and Newpoint Oil & Gas (USA) LLC, asserting claims for breach of contract, unjust enrichment, and quantum meruit. In two issues, PPL contends that the trial court erred in denying its special appearance because there is insufficient evidence to support the exercise of personal jurisdiction over it. We reverse and render.

## Background

### A.    Factual History

PPL is a gas exploration and production company organized and existing under the laws of Pakistan and with its principal place of business in Karachi. SPEC Energy DMCC (DMCC) is a company organized and existing under the laws of the United Arab Emirates (UAE) with its principal place of business in Dubai.

In 2015, PPL sought bids for a project to build a gas processing facility at Gambat South Block in Sindh, Pakistan (the Project). It published an invitation to bid in Dawn, the local newspaper in Pakistan, the Khaleej Times, a UAE newspaper, and the Houston Chronicle in Texas. Fareed Siddiqui, PPL's corporate representative, testified that PPL published the invitation in the Houston Chronicle because its website is widely read by oil and gas business professionals throughout the world and PPL wanted to reach an international audience. DMCC did not see

2

PPL's invitation in the Houston Chronicle but instead learned about the invitation to bid through "word of mouth." DMCC submitted a bid for the Project.

PPL and DMCC conducted negotiations in Dubai and Pakistan. Following PPL's selection of DMCC as the contractor for the Project, PPL and DMCC executed a Works Contract for Gas Processing Facility (GPF-III) at Gambat South Block on Engineering, Procurement, Construction and Commissioning (EPCC) Basis (the Contract) in Pakistan on May 9, 2016.

Under the Contract, DMCC was responsible for the design engineering, procurement (supply) of materials, construction, installation/erection, pre-commissioning, commissioning, and startup of the Project, as well as remedying any defects arising during the defect liability period. Under Section 3.2 of the Contract, all equipment and materials had to be supplied from vendors on PPL's approved vendor list which included vendors from all over the world. DMCC decided which approved vendors to select from the list. Section 3.7 of the Contract provided that DMCC was responsible for the cost of all services, including materials and personnel required for its performance, and the import of equipment and materials. Under Section 3.10, PPL was responsible for the issuance of documents required for DMCC's execution of its work.

Section 3.15 provided that daily progress review meetings would be held at the plant site and monthly progress review meetings would be held in Karachi,

Pakistan. Under Section 3.17, DMCC was required to provide insurance that complied with the applicable laws in the country of operation. Section 3.19 stated that the Contract "shall be construed and governed in accordance with the laws in Pakistan" and contract disputes were to "be referred for resolution by arbitration in Karachi." Section 3.34.1 provided:

> In case of JV/Consortium, the invoice(s) shall be raised by the lead consortium partner on behalf of itself and other JV consortium partner(s) clearly stating the amounts attributable to each consortium partner. The COMPANY shall make payment to the designated accounts of each consortium partner respectively as per the amounts mentioned in the invoices(s) [sic].

The Contract price was US $70,750,644.[1] Under the Contract, PPL was required to pay DMCC various percentages of the Contract price based upon DMCC's achievement of certain milestones. Section 3.28.13 of the Contract set forth the procedure for DMCC to submit an invoice for payment by PPL of a percentage of the Contract price once particular milestones were met. DMCC also provided bank guarantees and bonds from financial institutions located in Pakistan and the UAE.

## B.    Procedural History

By September 2018, relations between PPL and DMCC had deteriorated. Citing Section 3.24, DMCC invoked the arbitration clause of the Contract and filed

---

[1]    The amount due was (i) US $63,000,764; and (ii) PKR 811,800,027.00 (equivalent to US $7,749,880 on the date of the Contract) for the work.

for arbitration of the dispute in Pakistan. DMCC also filed claims against PPL in a court in Dubai related to the encashing of performance bonds DMCC had provided to PPL under the terms of the Contract. Additionally, DMCC and PPL have pending claims in the High Court of Sindh, Pakistan, related to the contract dispute. In February 2019, PPL and DMCC met in Islamabad to discuss their dispute and attempt to reach a resolution, but to no avail. On May 10, 2019, PPL terminated the Contract.

On May 23, 2019, DMCC and its "sister companies"—Specialty Process Equipment Corporation (SPEC) (a Texas corporation), SPEC Oil & Gas FZCO (SPEC Oil & Gas) (a UAE company), and S7 Construction Inc. (S7) (a Texas corporation)—filed suit against PPL in Harris County, Texas, asserting claims for breach of contract, unjust enrichment, and attorney's fees. They alleged that they entered into the Contract with PPL as a joint venture alliance with DMCC as the lead partner. They later amended their petition to add Newpoint Oil & Gas (USA) LLC, formerly known as Newpoint Gas LLC (a Texas limited liability company) (Newpoint), as a plaintiff as well as a claim for quantum meruit. DMCC and the other plaintiffs pleaded that the trial court had jurisdiction over PPL "pursuant to § 17.042 of the Texas Civil Practice and Remedies Code because [PPL] contracted with a Texas resident (namely SPEC, S7[,] and Newpoint), and each of SPEC, S7, and Newpoint performed the contract in whole or in part in Harris County, Texas."

5

On June 24, 2019, PPL filed a special appearance and motion to dismiss for lack of jurisdiction which it later amended. PPL argued that (1) it is a non-resident foreign corporation with its principal place of business in Pakistan, (2) the Contract was executed by PPL and DMCC only, (3) PPL had no relationship or connection with any other plaintiff, and (4) the entire work under the Contract was to be completed in Pakistan. It further asserted that the contract was executed in Pakistan and governed by the laws of Pakistan and that all payments under the Contract were made to DMCC from Pakistan. It attached copies of the filings related to the arbitration and litigation in Pakistan and the Contract as exhibits to its amended special appearance.

On September 26, 2019, DMCC and the other plaintiffs filed a motion for continuance of the special appearance hearing, a request for sanctions, and a motion for limited discovery. On September 27, 2019, they filed a response to PPL's amended special appearance arguing that Texas courts could exercise specific jurisdiction over PPL because (1) the Contract specifically authorized work to be performed in Texas and (2) PPL's contacts with Texas were substantial. They attached the following as exhibits to their response:

1) a copy of the Contract,

2) a Recommended Vendors/Manufacturers List,

3) Franchise Tax Account Status printouts reflecting that SPEC and S7 are registered businesses in the State of Texas,

4) the declarations of Zafar Sheikh, a Director of DMCC, SPEC, SPEC Oil & Gas, and S7, and Irtaza Sheikh, a Director of S7,

5) various purchase orders, and

6) photographs of employees at the Project site.

The trial court granted the motion for continuance and the request for limited discovery.

The parties completed jurisdictional discovery and subsequently filed additional briefing and evidence prior to the hearing on the special appearance. Following a non-evidentiary hearing, the trial court signed an order denying PPL's special appearance on June 7, 2021. The trial court also denied PPL's request for findings of fact and conclusions of law. This interlocutory appeal followed.

**Discussion**

PPL contends that the trial court erred in denying its special appearance because PPL lacks sufficient minimum contacts to support the assertion of specific or general jurisdiction, and that any implied finding from the trial court that PPL had sufficient minimum contacts to support the exercise of jurisdiction is not supported

by legally or factually sufficient evidence.[2] In support of its contention, it argues that (1) PPL contracted only with DMCC, a UAE company, and not the Texas plaintiffs, (2) an analysis of the factors applicable to breach-of-contract disputes demonstrates that jurisdiction is lacking, and (3) the remaining alleged minimum contacts relied on by appellees are insufficient. It further argues that exercising jurisdiction over PPL would offend traditional notions of fair play and substantial justice.

Appellees respond that PPL failed to satisfy its burden to negate each of the bases of personal jurisdiction alleged in their amended petition. They argue that PPL engaged in sufficient minimum contacts to establish specific jurisdiction because it (1) contracted with an entity with a strong presence in Texas, (2) conducted business with Texas residents, (3) advertised in Texas, and (4) required appellees, vendors, and contractors to comply with Texas law. It also asserts that a substantial amount of work within the scope of the Contract was performed in Texas.

## A.    Standard of Review

We review de novo a trial court's decision to grant or deny a special appearance. *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 806 (Tex. 2002). A plaintiff must plead allegations that bring a non-resident defendant

---

[2]    A nonresident's contacts can give rise to either general or specific personal jurisdiction. *Moncrief Oil Int'l, Inc. v. OAO Gazprom*, 414 S.W.3d 142, 150 (Tex. 2013). Because appellees concede on appeal that, on these facts, general jurisdiction does not exist as to PPL, we consider only whether specific jurisdiction exists.

within the provisions of the Texas long-arm statute. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 793 (Tex. 2002). The Texas long-arm statute provides that a non-resident who "does business" in the state, such as by contracting with a Texas resident where the contract is to be performed in whole or in part in Texas, is subject to personal jurisdiction. TEX. CIV. PRAC. & REM. CODE § 17.042(1); *BMC Software*, 83 S.W.3d at 795.

Once the plaintiff has pleaded sufficient jurisdictional allegations, the defendant filing a special appearance bears the burden to negate all bases of personal jurisdiction alleged by the plaintiff. *Kelly v. Gen. Interior Const., Inc.*, 301 S.W.3d 653, 658 (Tex. 2010). "Because the plaintiff defines the scope and nature of the lawsuit, the defendant's corresponding burden to negate jurisdiction is tied to the allegations in the plaintiff's pleading." *Id.* at 658; *Brenham Oil & Gas, Inc. v. TGS–NOPEC Geophysical Co.*, 472 S.W.3d 744, 764 (Tex. App.—Houston [1st Dist.] 2015, no pet.). The defendant can negate jurisdiction on either a factual or legal basis. *Kelly*, 301 S.W.3d at 659. Factually, the defendant can present evidence that it has no contacts with Texas, effectively disproving the plaintiff's allegations. *Id.* Legally, the defendant can show that even if the plaintiff's alleged facts are true, the evidence is legally insufficient to establish jurisdiction. *Id.*

When, as here, a trial court does not issue findings of fact and conclusion of law in support of a special appearance ruling, then "all facts necessary to support the

9

judgment and supported by the evidence are implied." *BMC Software*, 83 S.W.3d at 795. However, these findings are not conclusive when the appellate record includes both the clerk's and reporter's records, as it does here, and a party may challenge these findings for legal and factual sufficiency on appeal. *Id.*; *Waterman Steamship Corp. v. Ruiz*, 355 S.W.3d 387, 402 (Tex. App.—Houston [1st Dist.] 2011, pet. denied).

## B.    Applicable Law

Texas courts may assert personal jurisdiction over a nonresident defendant if (1) the Texas long-arm statute authorizes the exercise of jurisdiction, and (2) the exercise of jurisdiction is consistent with federal and state due process standards. *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007). The Texas long-arm statute allows Texas courts to exercise personal jurisdiction "as far as the federal constitutional requirements of due process will permit." *BMC Software*, 83 S.W.3d at 795 (quotation omitted). Federal due process requires that the nonresident defendant have purposefully established minimum contacts with the forum state, such that the defendant reasonably could anticipate being sued there. *Curocom Energy LLC v. Young–Sub Shim*, 416 S.W.3d 893, 896 (Tex. App.—Houston [1st Dist.] 2013, no pet.). The exercise of personal jurisdiction must also comport with traditional notions of fair play and substantial justice. *Id.*

Specific jurisdiction arises when the defendant purposefully avails itself of conducting activities in the forum state, and the cause of action arises from or is related to those contacts or activities. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985); *Kelly*, 301 S.W.3d at 658; *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 338 (Tex. 2009). In a specific jurisdiction analysis, "we focus . . . on the 'relationship among the defendant, the forum[,] and the litigation.'" *Moki Mac*, 221 S.W.3d at 575–76 (quoting *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 228 (Tex. 1991)). The plaintiff must show a substantial connection between the defendant's contacts with the forum state and the operative facts of the litigation. *Id.* at 585. The "purposeful availment" inquiry has three parts. *See Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 785 (Tex. 2005). First, only the defendant's contacts with the forum are relevant, not the unilateral activity of another party or a third person. *Id.* Second, the contacts relied upon must be purposeful rather than random, fortuitous, or attenuated. *Id.*; *see also Burger King*, 471 U.S. at 475 n.18. Third, the "defendant must seek some benefit, advantage, or profit by 'availing' itself of the jurisdiction." *Michiana*, 168 S.W.3d at 785.

## C.    Specific Jurisdiction —Breach of Contract Claim

In its amended petition, appellees pleaded that "[t]he Court has jurisdiction over PPL pursuant to § 17.042 of the Texas Civil Practice and Remedies Code

11

because [PPL] contracted with a Texas resident (namely SPEC, S7[,] and Newpoint), and each of SPEC, S7[,] and Newpoint performed the contract in whole or in part in Harris County, Texas." PPL contends that the evidence conclusively negates this alleged basis for jurisdiction. It argues that even if the evidence showed that such a contract existed, jurisdiction would nevertheless be lacking.

### 1. Parties to the Contract

"As a general rule, the benefits and burdens of a contract belong solely to the contracting parties, and no person can sue upon a contract except he be a party to or in privity with it." *First Bank v. Brumitt*, 519 S.W.3d 95, 102–03 (Tex. 2017) (quotation omitted); *Kenyon Int'l Emergency Servs., Inc. v. Starr Indem. & Liab. Co.*, No. 01-17-00386-CV, 2018 WL 6241461, at *5 (Tex. App.—Houston [1st Dist.] Nov. 29, 2018, pet. denied) (mem. op.). Here, the Contract for the construction of the gas processing facility in Pakistan states that it is between PPL, the Company, and DMCC, the Contractor. The contract is signed only by two parties: PPL and DMCC. No other party appears on the face of the Contract.

Appellees argue that they are parties to the Contract because they bid on the Project and executed the Contract as a consortium/joint venture. They assert that the consortium/joint venture consisted of DMCC, as the lead consortium/joint venture partner, and the other entities including SPEC, SPEC Oil & Gas, and S7. They argue that the Contract "indisputably acknowledges that a consortium/joint venture is

12

being used for the Project." In support of their argument, appellees point to Section 3.34.1 of the Contract:

> In case of JV/Consortium, the invoice(s) shall be raised by the lead consortium partner on behalf of itself and other JV consortium partner(s) clearly stating the amounts attributable to each consortium partner. The COMPANY shall make payment to the designated accounts of each consortium partner respectively as per the amounts mentioned in the invoices(s) [sic].

Section 3.34.1 does not establish that appellees executed the Contract as a consortium/joint venture. Rather, the provision provides the procedure for invoicing *in the event* of a joint venture/consortium. And, as noted above, the Contract itself does not reflect execution as a consortium/joint venture. Siddiqui testified that the bidding procedure for the Contract requires any joint venture be identified in writing and that a copy of the joint venture agreement, which would include the composition of the joint venture, be provided with the bidding document. There is nothing in the record showing that a joint venture agreement was provided in the bid. Irtaza Sheikh, appellees' corporate representative, testified that he did not know if an agreement among the purported consortium members existed. There is no evidence that appellees executed the Contract as a joint venture.

PPL argues that even if DMCC had executed the Contract as a joint venture/consortium, this fact alone would not render each individual member of the joint venture an actual party to the agreement. We agree. "[A] joint venture, like a partnership, is an entity legally distinct from the partners." *Bank One, Tex., N.A. v.*

13

*Stewart*, 967 S.W.2d 419, 444 (Tex. App.—Houston [14th Dist.] 1998, pet. denied). And, "a contract with one corporation . . . is generally not a contract with any other corporate affiliates." *In re Merrill Lynch Trust Co. FSB*, 235 S.W.3d 185, 191 (Tex. 2007) (orig. proceeding); *see also R. Hassell Builders, Inc. v. Texan Floor Serv., Ltd.*, 546 S.W.3d 816, 829–30 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (noting that while corporation and joint venture were part of same "corporate family," they were each separate legal entities and "[a]s such, they are each responsible for their own debts and liabilities.").

### 2. Purchase Orders

Appellees argue that, pursuant to the Contract, each individual invoice for approved work performed by the consortium members constituted an agreement for PPL to pay. They assert that each individual invoice that DMCC sent for SPEC and S7 (Texas corporations) was an individual contract for PPL to pay SPEC and S7. This argument is unavailing. The "invoices" upon which appellees rely are purchase orders sent by DMCC to various vendors. PPL is not named as a purchaser on any of the purchase orders. The materials purchased were all to be shipped to SPEC Oil & Gas in Dubai. Irtaza Sheikh testified that only DMCC, and no other party, was to receive payments from PPL under the Contract. This comports with Section 3.7.20 of the Contract which provides that DMCC was responsible for procuring and paying vendors for the materials. Because PPL was not a party to the purchase orders, the

14

orders do not establish a contract between PPL and SPEC or PPL and S7. *See Brumitt*, 519 S.W.3d at 102 (noting benefits and burdens of contract belong only to contracting parties); *see also Shell Compania Argentina de Petroleo, S.A. v. Reef Expl., Inc.*, 84 S.W.3d 830, 838 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) (holding that defendant was not party to various agreements and therefore agreements were not relevant to consideration of issue of specific jurisdiction).

### 3. Factors Applicable in Breach-of-Contract Disputes

Moreover, even if appellees could demonstrate that PPL contracted with the Texas entities, that fact alone is insufficient to confer jurisdiction. Merely contracting with a Texas corporation does not satisfy the minimum contacts requirement. *Shell Compania Argentina*, 84 S.W.3d at 837 (citing *TeleVentures, Inc. v. Int'l Game Tech.*, 12 S.W.3d 900, 908 (Tex. App.—Austin 2000, pet. denied)). Prior negotiations, contemplated future consequences, the terms of a contract, and the parties' course of dealing are all factors that must be considered in determining whether a defendant purposefully established minimum contacts within the forum. *Id.*

In this case, the undisputed evidence shows that contract negotiations and execution of the Contract took place in Dubai or Pakistan, not Texas. As to contemplated future consequences, the Contract expressly provides that any future disputes would be governed by Pakistani law and subject to arbitration in Pakistan. This evidence supports a finding that PPL did not purposefully avail itself of Texas.

15

*See Michiana*, 168 S.W.3d at 792 (noting that "insertion of a clause designating a foreign forum suggests that no local availment was intended").

The "place of contractual performance" is also an important consideration in determining whether a defendant purposely availed itself of the forum state. *See Sayers Constr., L.L.C. v. Timberline Constr., Inc.*, 976 F.3d 570, 573 (5th Cir. 2020). As part of this consideration, courts look at whether the contract contemplated or required performance in Texas, where the defendant performed its obligations, and where the contract centered. *See M & F Worldwide Corp. v. Pepsi–Cola Metro. Bottling Co.*, 512 S.W.3d 878, 889 (Tex. 2017) (noting fact that contract did not contemplate or require performance in Texas); *see also Moncrief Oil Int'l Inc. v. OAO Gazprom*, 481 F.3d 309, 312 (5th Cir. 2007) (concluding plaintiff's unilateral performance of activities in Texas was insufficient where "the defendant did not perform any of its obligations in Texas, the contract did not require performance in Texas, and the contract is centered outside of Texas."). Here, the Contract is for the construction of a gas processing facility located in Pakistan—thus, the place of the Contract's performance is centered in Pakistan. The Contract also provided that regular status meetings would be held either in Karachi or at the site in Pakistan. All payments were made to DMCC from Pakistan. Nothing in the Contract contemplates or requires performance in Texas. *See Univ. of Ala. v. Suder Found.*, No. 05-16-00691-CV, 2017 WL 655948, at *7 (Tex. App.—Dallas Feb. 17, 2017, no pet.)

(mem. op.) (concluding circumstances did not establish purposeful availment where "[the Defendant's] contract performance was substantially in Alabama, and the parties' contractual relationship was centered in Alabama, not Texas"); *Weatherford Artificial Lift Sys., Inc. v. A & E Sys. SDN BHD*, 470 S.W.3d 604, 615 (Tex. App.—Houston [1st Dist.] 2015, no pet.) (concluding that evidence showing contract was negotiated in Malaysia and required that payment would have been made from Malaysia was insufficient to support exercise of jurisdiction in Texas).

### 4. Approved Vendor List

Appellees argue that Section 3.2 of the Contract contemplated performance in Texas. That section provides: "All equipment and materials supplied under the CONTRACT shall be new/unused and from the vendor as mentioned in recommended manufacturer/vendor list . . ." They point out that over 90% of the approved vendors are located outside of Pakistan, with many of them in the United States, and the Contract contemplated that the parties to the Contract would use Texas vendors for performance of the Project. Thus, they argue, PPL specifically targeted Texas residents.

While the forty-four page approved vendor list includes some Texas vendors, it includes companies from all over the world and nearly every one of the companies is listed as international. The international focus of the approved vendor list suggests that Texas was neither targeted nor the focus of the list. *See Suder Found.*, 2017 WL

17

655948, at *7 (concluding fact that defendant university was obligated to assist in development of Texas-based foundation's national program and provide it with data to promote its larger nationwide mission underscored that contractual relationship was not Texas-centered). And, appellees' corporate representative testified that it was DMCC who chose the Texas vendors, not PPL. Thus, it stands to reason that DMCC could have equally chosen a vendor from outside of Texas.

5.     **Insurance Provision**

Appellees assert that Section 3.17 of the Contract requires all vendors and subcontractors to carry insurance that complies with the law of the state that the vendor is in—that is, comply with the laws of the State of Texas. They argue that this evidence demonstrates that PPL purposely availed itself of Texas law. However, by its terms, Section 3.17 applies to any subcontractor anywhere in the world and is not specific to Texas. This means that Texas law would only be implicated when DMCC selected a Texas vendor. Such a contact is merely fortuitous rather than purposeful. *See Michiana*, 168 S.W.3d at 785 (stating that contacts relied upon must be purposeful rather than random, fortuitous, or attenuated to constitute purposeful availment).

6.     **Work Performed in Texas and Other States**

Appellees contend, as they did in the trial court below, that PPL engaged in more than $16 million worth of work related to the Contract with entities located in

the United States of which approximately 66% was performed in Texas or by Texas residents. They assert that the total amount of work contracted for by Texas residents on the project is $10,590,409.37. Thus, they argue, Texas residents made up a large part of PPL's business dealings related to the Project.

In their response to PPL's special appearance, appellees included a chart listing the vendors chosen by DMCC who provided materials for the Project. The chart reflects that $16 million worth of work for the gas processing plant was performed in Texas and various other states. The chart shows that a significant portion of the materials were provided from vendors outside of Texas—including Wisconsin, Tennessee, New York, Indiana, and Oklahoma—and two of the locations are listed as "USA." The work performed for the project outside of Texas is not relevant to determining whether PPL had any contacts with Texas. *See J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 886 (2011) (plurality op.) ("Here the question concerns the authority of a New Jersey state court to exercise jurisdiction, so it is petitioner's purposeful contacts with New Jersey, not with the United States, that alone are relevant."). After the amount of work performed by the non-Texas entities is deducted, the chart shows that the amount of work performed in Texas is slightly more than $10.5 million. The chart also includes two purchase orders from Newpoint that DMCC stated in the arbitration were cancelled. With the cancellation of those purchase orders, the amount of work performed in Texas is reduced to slightly more

than $1.8 million, of which only $180,000 was performed by an appellee (S7) in this case. When viewed in the context of the entire amount ($16 million), and given the undisputed evidence that DMCC, not PPL chose the vendors for the project, this evidence is insufficient to support an implied finding that "millions of dollars' worth of work was perform[ed] in Texas by SPEC plaintiffs."

### 7. Inspection in Texas

Appellees argue that, under the Contract, PPL ordered an inspection of the work completed in Texas, and that this contact demonstrates purposeful availment.

Siddiqui testified that PPL hired TUV, an Austrian company, to perform inspections all over the world, and that the inspectors would go "anywhere where []DMCC tells them to go for inspection." Siddiqui testified that the company performed one inspection in Texas, one in Colorado, and forty or fifty in the UAE. One inspection in Texas, which occurred at DMCC's direction, is merely an isolated contact which cannot support jurisdiction. *See Michiana*, 168 S.W.3d at 785 (stating that, for purposes of purposeful availment inquiry, only defendant's contacts with forum are relevant, not unilateral activity of third person, and contacts relied upon must be purposeful rather than random, fortuitous, or attenuated).

### 8. Houston Chronicle Advertisement

Appellees point to PPL's advertisement in the Houston Chronicle to publish its invitation to bid on the Project as evidence that PPL targeted Texas businesses and marketed its project in Texas.

Siddiqui testified that PPL published the invitation to bid on the Project in Dawn, the local newspaper in Pakistan, the Khaleej Times, a UAE newspaper, and the Houston Chronicle in Texas. He testified that PPL published the invitation in the Houston Chronicle because its website is widely read by oil and gas business professionals throughout the world and PPL wanted to reach an international audience. Irtaza Sheikh acknowledged that DMCC did not see the Houston Chronicle listing but instead learned about the invitation to bid through "word of mouth." This single advertisement in the Houston Chronicle, intended for an international audience and which DMCC did not see, is an isolated contact that does not satisfy jurisdictional requirements. *See id.*

### D. Specific Jurisdiction—Unjust Enrichment and Quantum Meruit Claims

In addition to their breach of contract claim, appellees asserted claims for unjust enrichment and quantum meruit against PPL. As to their unjust enrichment claim, appellees alleged:

- Defendant received Plaintiffs' work valued at the full amount of the contract. This money belongs to Plaintiffs in equity and good conscience. Further, the goods and services were obtained by

21

Defendant on account of fraud and taking undue advantage of Plaintiffs (directly and indirectly[)] through Defendant's representatives.

As to their quantum meruit claim, appellees alleged:

- Plaintiffs provided valuable services and materials to Defendant PPL as evidenced by its detailed invoices documenting these items. These services and supplies were rendered for the direct benefit of Defendant PPL. Further, these services and supplies were accepted by Defendant PPL, and Defendant PPL was notified that in performing these services and providing these supplies, Plaintiff expected to be paid by Defendant PPL.

Under Texas's long-arm statute, appellees were required to plead that PPL committed the alleged tortious acts in Texas. *See Kelly*, 301 S.W.3d at 658–59 ("If the plaintiff fails to plead facts bringing the defendant within reach of the long-arm statute (i.e., for a tort claim, that the defendant committed tortious acts in Texas), the defendant need only prove that it does not live in Texas to negate jurisdiction."); *Proppant Sols., LLC v. Delgado*, 471 S.W.3d 529, 536 (Tex. App.—Houston [1st Dist.] 2015, no pet.) (citing *Kelly*, 301 S.W.3d at 658–59). Neither appellees' amended petition nor its responsive briefing alleges that PPL committed any acts in Texas much less any tortious acts. That is, appellees did not plead where any alleged fraud and taking of undue advantage occurred, and appellees do not contend that these alleged acts occurred in Texas. Similarly, appellees' allegations underlying their quantum meruit claim do not identify where PPL's alleged actions occurred. Moreover, we note that any alleged services and supplies would presumably have

22

been accepted by PPL at the plant in Pakistan.[3] *See Vinmar Overseas Singapore PTE Ltd. v. PTT Int'l Trading PTE Ltd.*, 538 S.W.3d 126, 133 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) ("When the plaintiff fails to allege an act by the defendant occurring in Texas, the plaintiff has not met its initial burden of pleading acts sufficient to invoke jurisdiction over the nonresident defendant."); *see also Moncrief*, 414 S.W.3d at 153–54, 156–57 (holding nonresident defendant was subject to jurisdiction for misappropriation of trade secrets claim where defendant obtained trade secrets in Texas but not for tortious interference claim where alleged acts of interference occurred outside of Texas). Because PPL proved that it is not a Texas resident, it negated personal jurisdiction over appellees' unjust enrichment and quantum meruit claims. *See Kelly*, 301 S.W.3d at 658–59.

Accordingly, we conclude that the evidence is insufficient to support any implied finding that PPL had sufficient minimum contacts with Texas to support the exercise of jurisdiction over it. Because PPL did not purposefully avail itself of the privilege of conducting activities in Texas, the trial court erred in denying its amended special appearance. Having concluded that PPL negated all bases for the assertion of personal jurisdiction, we sustain PPL's issues.[4]

---

[3]     Appellees do not address the issue of jurisdiction over their unjust enrichment and quantum meruit claims in their brief on appeal.

[4]     In light of our holding, we need not address the question of whether the exercise of personal jurisdiction would offend the traditional notions of fair play and substantial

## Conclusion

We reverse the trial court's June 7, 2021 order denying PPL's amended special appearance and render judgment dismissing appellees' claims against PPL.

Amparo Guerra
Justice

Panel consists of Justices Goodman, Hightower, and Guerra.

---

justice. *See 11500 Space Ctr., L.L.C. v. Private Cap. Grp., Inc.*, 577 S.W.3d 322, 336 n.9 (Tex. App.—Houston [1st Dist.] 2019, no pet.).